**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>VINCENT DONTA MCSWAIN,<br><br>Defendant |

Criminal Action No. 19-80 (CKK)

**MEMORANDUM OPINION**
(May 29, 2019)

In this criminal action, Defendant Vincent Donta McSwain is charged with (1) Unlawful Possession of Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year in violation of 18 U.S.C. § 922(g)(1), and (2) Receipt or Possession of Firearm Unidentified by Serial Number in violation of 26 U.S.C. § 5861(i). Indictment, ECF No. 3. Defendant has moved to suppress any and all tangible physical evidence and any statements whether obtained before, during, or after his arrest as the result of the allegedly unlawful seizure from his person of a loaded firearm without a serial number on February 27, 2019. Defendant argues that such evidence was seized in violation of the Fourth Amendment. Specifically, Defendant contends that officers lacked probable cause to detain him and that the officers further lacked reasonable and articulable suspicion to frisk him. If such evidence was unconstitutionally obtained, then it must be suppressed.

Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a

---
[1] The Court's consideration has focused on the following documents:
- Def.'s Mot. to Suppress Physical Evidence and Statements ("Def.'s Mot."), ECF No. 18;
- Gov.'s Opp'n to Def.'s Mot. to Suppress Tangible Evidence ("Gov.'s Opp'n"), ECF No. 20;
- Response to the Gov.'s Opp'n to Mot. to Suppress Physical Evidence and Statements ("Def's Response"), ECF No. 21;
- Gov.'s Ex. 1, body-worn camera footage of MPD Officer Jacobi Crawley;

whole, the Court DENIES Defendant's Motion to Suppress. The Court concludes that the Fourth Amendment was not violated when law enforcement officers detained Defendant, conducted a limited search of him, and seized from him a loaded firearm without a serial number. Based on a traffic violation, the officers had probable cause to temporarily detain Defendant, and, during that temporary detention, the officers developed a reasonable articulable suspicion to conduct a limited search.

## I. FINDINGS OF FACT

The Court held an evidentiary hearing on Defendant's motion to suppress on May 14, 2019. The Court has considered the evidence presented during the hearing. In doing so, the Court considered the demeanor and behavior of the witnesses on the stand, the witnesses' manner of testifying, whether the witnesses impressed the Court as truthful, whether the witnesses impressed the Court as having an accurate memory and recollection, whether the witnesses had any motive for not telling the truth, whether the witnesses had a full opportunity to observe the matters about which they testified, and whether the witnesses had any interest in the outcome of the case, or friendship or hostility to the other persons concerned with the case. The Court also considered the reasonableness or unreasonableness and the probability or improbability of the testimony of the witnesses in determining whether to accept it as true and accurate, as well as whether the testimony was contradicted or supported by other credible evidence. The Court has also considered the pleadings, the footage from officers' body-worn cameras, and the entire

---

- Gov.'s Ex. 2, body-worn camera footage of MPD Officer Rafael Lopez;
- Gov.'s Ex. 3, body-worn camera footage of MPD Officer Kyle Weber; and
- Gov.'s Ex. 4, copy of Notice of Infraction.

record in this case.

The Court credits the testimony of the witnesses, Officer Allorie Sanders and Officer Robert Kelly, as follows.

The Court makes the following findings of fact. The Court will first make findings of fact that are relevant to the Defendant's motion and undisputed and/or uncontroverted by any evidence, and then make findings as to facts that are relevant and disputed or controverted by some evidence.

**A. The Undisputed or Uncontroverted Relevant Evidence**

During the evidentiary hearing, the Government presented two witnesses. Officer Allorie Sanders has worked for the Metropolitan Police Department for almost four years. May 14, 2019 Hr'g Tr. 9: 9-13. She works with the crime suppression team which patrols the sixth district in the District of Columbia looking for illegal firearms, drug offenses, and wanted individuals. *Id.* at 9: 14-21. Officer Robert Kelly has worked for the Metropolitan Police Department for approximately four and a half years. *Id.* at 54: 2-3. He is also with the crime suppression team. *Id.* at 54: 5-6. Defendant presented no witnesses.

On February 27, 2019, both Officer Sanders and Officer Kelly were on duty separately. Officer Sanders was driving in a car with her partners Officer Gennady Julien and Officer Kyle Weber. *Id.* at 10: 3-6. While the officers were patrolling the area around 5100 Queens Stroll Place in Southeast, District of Columbia, the officers came across a black Audi vehicle. *Id.* at 10: 11-15. Officer Sanders and the other officers in her patrol vehicle stopped this car. Officer Sanders testified that the car was stopped due to a suspected window tint violation. *Id.* at 31: 13-

15. However, as will be further explained below, Defendant disputes this testimony, contending that the alleged tint violation was merely a pretext for stopping the vehicle.

After the car was stopped, Officer Sanders ran the license plate tag number through the system, as was her normal procedure. *Id.* at 31: 2-5. When Officer Sanders ran the license plate tag number through the system, the system showed that the vehicle was not properly registered to the driver. *Id.* at 10: 13-24.

The officers then conducted a traffic stop investigation. *Id.* at 11: 1. Officer Julien approached the driver's side of the stopped vehicle and Officer Sanders approached the passenger's side, where Defendant was seated. *Id.* at 11: 5-8. Officer Julien asked the driver for his license, registration, and other official information. *Id.* After the driver supplied his information, the officers conducted a new check through the system, but the vehicle still came back as unregistered. *Id.* at 11: 12-15.

After the officers could not confirm the registration of the vehicle, they asked the driver and the Defendant to step out of the vehicle, and the driver consented to a search of the vehicle. *Id.* at 12: 13-15. Officer Sanders had the identification cards for both the driver and Defendant. *Id.* at 12: 23-24.

After Defendant exited the car, Officer Sanders testified that Defendant began trying to leave the scene, asking her for his identification card back, saying that he had "nothing to do with this," and asking if he could go to his father's house which was nearby. *Id.* at 13: 2-9. Officer Sanders stated that she told Defendant, "[y]ou're rushing me. Just slow down. Let me do what I have to do. Then we can get you out of here." *Id.* at 13: 12-14. Each time Defendant tried

to walk away or leave the scene, Officer Sanders further explained that he had to stay and wait until the investigation was over. *Id.* at 13: 15-17.

Officer Sanders's statement is supplemented by Government's Exhibit 1, the body-cam footage from Officer Crawley. On the video, Defendant points away from the scene of the investigation and attempts to walk away. Gov.'s Ex. 1, 4:50. Officer Sanders then tells him to "hold on" so that the investigation could be completed. *Id.* Defendant goes on to explain that his father was in the area, that he had nothing to do with the investigation, and that he wanted to go home. *Id.* at 5: 15. Defendant was repeatedly told to relax by the officers.

While the officers were conducting the search of the vehicle, the driver was standing near the trunk of the vehicle with his backside leaning against the vehicle. May 14, 2019 Hr'g Tr. 14: 9-10. Defendant was also standing at the rear of the vehicle with the front of his lower body awkwardly pressed against the car. *Id.* at 14: 21-22. Defendant had not been told to stand in that position, but he had also not been asked to change positions. *Id.* at 34: 15-21. Officer Sanders testified that "how he was standing, it was in the motion of trying to conceal something in the front half of his body." *Id.* at 34: 25- 35: 1.

Officer Kelly asked both the driver and Defendant to step away from the car so that the officers could search the trunk. Defendant began slowly walking towards Officer Kelly. *Id.* at 15: 15-23. As will be discussed further below, the parties dispute whether or not Defendant stopped where Officer Kelly had requested or whether he continued walking past Officer Kelly in an attempt to leave the scene.

At this point, Defendant was stopped by Officer Kelly. Officer Kelly along with Officer Rafael Lopez then brought Defendant to the side of the police vehicle. *Id.* at 17: 11-12. The

officers were on either side of Defendant so that Defendant could not leave. *Id.* at 69: 5-8. Defendant's hands were placed on the vehicle. *Id.* at 72: 20-22. Officer Kelly testified that Defendant's hands were placed on the vehicle because Defendant "had made several attempts to keep leaving the scene, we then brought him over to the vehicle and asked him to keep his hands there. It's our general practice if we're going to then attempt to do a pat-down or ask for consent, that's where we will stand someone and have them put their hands." *Id.* at 72: 25-73: 5. Defendant was asked to place his hands in this position for officer safety. *Id.* at 73: 10-11.

Officer Kelly asked Defendant if he could do a pat-down. Defendant replied "huh" or something to that effect, but Defendant did not say yes or no. *Id.* at 67: 11- 68: 3; Gov.'s Ex. 2, 10: 35. Officer Lopez asked Defendant if he had any weapons on him, and he replied "Yes. I have a weapon." Then, Officer Kelly asked what type of weapon he had. Defendant said, "I got a gun." May 14, 2019 Hr'g Tr. 17: 18-18: 8.

Again, this interaction was captured by Officer Lopez' body-camera footage. In the video, Officer Lopez asks Defendant if he has a weapon. Defendant replies that he does have a weapon. Gov.'s Ex. 2, 10:38. Based on Officer Kelly's question, Defendant then clarifies that he has a firearm on him. *Id.* at 10:44.

After admitting that he was in possession of a firearm, Defendant was handcuffed, and a pat-down was conducted. As a result of the pat-down, the officers recovered a loaded firearm with no serial number. May 14, 2019 Hr'g Tr. 18: 11-13. The Defendant was wearing jeans with spandex tights underneath. The gun was located between Defendant's Spandex and his bare thigh near his kneecap. *Id.* at 27: 3-4. The officers photographed the gun while it was still in Defendant's pants in order to document where the firearm was found. *Id.* at 26: 13-18.

6

After Defendant was arrested, the driver was ultimately released. The driver was given a Notice of Infraction for a failure to have a current car registration. *Id.* at 32:1-2; *see also* Gov.'s Ex. 4. The driver was not given any sort of warning or ticket for his possible window tint violation. May 14, 2019 Hr'g Tr. 49: 18-20. However, Officer Weber, who is certified in tint violations was on the scene. Additionally, Officer Lopez, who was on the scene, is certified in tint violations and carries his tint-testing equipment with him. *Id.* at 50: 5-18.

**B. The Disputed or Controverted Relevant Evidence**

During the evidentiary hearing, Defendant disputed two pieces of testimony. First, Defendant contends that the vehicle in which Defendant was a passenger was not stopped for a window tint violation; instead, the window tint violation was merely pretext. Second, Defendant argues that, after he was asked to move so that the officers could search the trunk, he stopped where Officer Kelly instructed him to stop without attempting to leave the scene. The Court will address both factual disputes in turn.

First, the Court concludes that the evidence supports Officer Sanders's testimony that the vehicle was stopped for a tint violation. Officer Sanders testified that "[t]he initial stop was for the tints." *Id.* at 47: 6-7. Additionally, Officer Sanders testified that one of the officers in the police car with her, Officer Weber, was certified in verifying window tint violations. *Id.* at 50: 18. While Officer Weber did not have the tint-testing equipment with him, another officer who later arrived at the scene, Officer Lopez, was also tint certified and had the tint-testing equipment with him. *Id.* at 50: 5-6.

Officer Sanders further testified that it is her normal practice to "run tags once the vehicle has come to a complete stop." *Id.* at 31: 4-5. After running the tags on the vehicle which had

7

been stopped for a tint violation, Officer Sanders discovered that "the tags did not come back to the vehicle." *Id.* at 31: 15-16. The driver's failure to properly register his vehicle then became the focus of the stop.

Defendant contends that the alleged window tint violation was simply a pretext to stop the vehicle. Defendant argues that the officers' failure to test the tint of the windows or to give the driver a ticket for his tinted windows is evidence that the officers did not stop the vehicle due to a window tint violation. But, Defendant's argument is directly contradicted by Officer Sanders's testimony. *See, e.g., Id.* at 31: 13-16 ("The initial reason why we saw the vehicle was for the tints, which is the initial cause."). Lacking anything but speculation from Defendant, the Court credits Officer Sanders's testimony.

Moreover, given the events which occurred following the initial stop, the Court finds it reasonable that the officers were not focused on the driver's window tint violation despite the violation being the initial cause of the stop. After stopping the vehicle, the officers determined that the vehicle was not registered to the driver. An improper registration can indicate car theft, a much more serious issue than a tint violation. In fact, the driver was given a Notice of Infraction for his failure to properly register his car. *See* Gov.'s Ex. 4. Additionally, during the stop, the officers searched Defendant and found a firearm, further deflecting the officers' focus away from the driver's possible window tint violation. Accordingly, the Court credits Officer Sanders's testimony and concludes that the vehicle was originally stopped due to a possible window tint violation.[2]

---

[2] During the evidentiary hearing, Defense counsel argued that, as to the window tinting, "what we saw in the tape" may not be consistent "with what the officers said." May 14, 2019 Hr'g Tr. 85: 22-25. However, Defense counsel introduced no evidence that the windows were not tinted. Moreover, in reviewing the officers' body-camera footage, while the windows did not appear to

Defendant's second dispute involves his actions when Officer Kelly asked him to step away from the stopped vehicle so that the officers could search the trunk. Defendant contends that he slowly walked towards Officer Kelly and stopped where he was instructed to stop without indicating an intention to leave the scene. Defendant's argument is directly contradicted by the testimony at the evidentiary hearing and by the officers' body-camera footage.

During the evidentiary hearing, Officer Sanders testified that Defendant appeared like he was trying to leave the scene when he walked towards Officer Kelly. May 14, 2019 Hr'g Tr. 16: 9-11. She explained that Defendant made a comment about leaving to "catch my ride. My people are over there." *Id.* at 15: 21-23. Additionally, Officer Sanders testified that Defendant walked slightly past Officer Kelly and that Officer Kelly had to follow behind him to get him to stop. *Id.* at 46: 14-16.

Officer Kelly's testimony echoed Officer Sander's testimony. Officer Kelly stated that he asked Defendant to come stand by one of the police vehicles and pointed to that vehicle. *Id.* at 56: 1-3. He further testified that Defendant started to move towards the vehicle as requested. But, when another car drove past, Defendant attempted to leave the scene by indicating that he knew the person in the car and walking towards the car. *Id.* at 56: 5-11. Defendant then walked past Officer Kelly, and Officer Kelly moved towards Defendant and brought him back over to the police vehicle. *Id.* at 57: 1-2.

The testimony of both officers is substantiated by the body-camera footage of officers at the scene. In Government's Exhibit 2, which features the body-camera footage from Officer Lopez, the driver is standing near the stopped vehicle and Defendant is leaning against the

---

be clear, the precise degree of tint was not apparent to the Court.

stopped vehicle with his front-side leaning against the car. Gov.'s Ex. 2, 10:00. In order to search the trunk of the vehicle, Officer Kelly calls the driver to come over to him, then calls for Defendant. Defendant begins walking in the direction of Officer Kelly. Defendant then points away from the investigation scene and towards a car that had just driven by. Defendant walks slightly past Officer Kelly towards the car until he is stopped. *Id.* at 10: 15. Officer Lopez can then be heard saying that Defendant should be patted down because "he keeps trying to walk away." *Id.* at 10: 22. Government's Exhibit 3, featuring the body-camera footage of Officer Weber, shows Defendant walking slightly past Officer Kelly towards a car that had just driven by before he was stopped by Officer Kelly. Gov.'s Ex. 3, 14:10.

Based on the officers' testimony as well as the Court's review of the officers' body-camera footage, it appears to the Court that Defendant was attempting to leave the scene when he walked towards Officer Kelly. Defendant did not run and did he not resist when Officer Kelly stopped him. However, both from Defendant's words and his actions, it was reasonable for the officers to assume that Defendant was attempting to leave the scene.

## II. DISCUSSION

Defendant argues that the tangible physical evidence seized by the officers from Defendant's body and any statements obtained before, during, or after his arrest on February 27, 2019 were obtained in violation of the Fourth Amendment. As such, Defendant argues that the evidence should be suppressed. The Court disagrees and finds that the evidence was not obtained unconstitutionally.

"Time and again" the Supreme Court "has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se*

unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (internal quotation marks omitted). As is relevant here, one of those exceptions occurs when officers conduct a "*Terry* search." Under *Terry v. Ohio*, 392 U.S. 1 (1968), during a properly justified stop on the street, if a law enforcement officer has a reasonable articulable suspicion "that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," then that officer may conduct a limited search "to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24. In order for a *Terry* search to be justified, the circumstances at the time of the search and seizure must "warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id.* at 22 (internal quotation marks omitted).

Here, the stop of Defendant was properly justified. Generally, when a traffic offense is committed in the view of a police officer, the stop of the vehicle is lawful. "The Fourth Amendment does not bar the police from stopping and questioning motorists when they witness or suspect a violation of traffic laws, even if the offense is a minor one." *United States v. Mitchell*, 951 F.2d 1291, 1295 (D.C. Cir. 1991). Here, the officers stopped the vehicle in which Defendant was a passenger due to a window tint violation. May 14, 2019 Hr'g Tr. 31: 13-16 ("The initial reason why we saw the vehicle was for the tints, which is the initial cause."). After stopping the car, Officer Sanders ran the license plate tag number and discovered that the car was not properly registered. *Id.* at 31: 15-16. Accordingly, the officer's decision to stop the vehicle was proper.

After being stopped by the officers, the driver consented to a search of the vehicle and the officers asked the driver and Defendant to exit the vehicle. When conducting a lawful traffic stop, officers are permitted to ask the driver as well as any passengers to exit the vehicle. *See Maryland v. Wilson*, 519 U.S. 408, 410 (1997) (explaining that officers may order the passenger of a lawfully stopped vehicle to exit the vehicle). As such, it was also proper for the officers to ask the driver and Defendant to exit the vehicle after the vehicle was stopped for the window tint and the registration violations.

Moreover, at this time, "everyone in the vehicle," including the passenger Defendant was legally detained for the duration of the stop by virtue of being in the vehicle at the time that it was lawfully stopped. *Brendlin v. California*, 551 U.S. 249, 255 (2007). As the United States Supreme Court has held, "the temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). The stop does not end until the police have completed their investigation and informed the parties that they are free to leave the scene. *Id.* It is irrelevant that, here, the vehicle was stopped for a window tint violation and the search did not relate to that alleged window tint violation. "An officer's inquiries into matters unrelated to the justification for the traffic stop… do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Id.* Here, Defendant has not alleged that the consented to search of the vehicle unreasonably extended the duration of the stop. And, the Court finds that the duration of the officer's search of the vehicle, lasting no more than 20 minutes, was not unreasonable. *See United States v. Nurse*, 916 F.2d 20, 24-25 (D.C. Cir. 1990) (approving 20 to 30-minute investigatory detention). Accordingly, the Court concludes that

Defendant was lawfuly seized and "not free to terminate the encounter with the police and move about at will" while the officers were conducting their investigation. *Johnson*, 555 U.S. at 333.

Having found that Defendant's stop and temporary seizure were justified, the Court must now determine whether or not the officers had reasonable articulable suspicion to conduct a limited search "to determine whether [Defendant was] carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24. The Court concludes that the officers did have a reasonable articulable suspicion for conducting their limited pat-down of Defendant, making the search lawful and the evidence obtained admissible.

In determining whether an officer has reasonable suspicion to conduct a pat-down following a lawful stop, the Court considers the totality of the circumstances. As the United States Circuit Court for the District of Columbia has explained, "[a]n officer on the beat does not encounter discrete, hermetically sealed facts. Rather, as we repeatedly have cautioned, the question of whether reasonable suspicion existed can only be answered by considering the totality of the circumstances as the officer on the scene experienced them.... Hence, even though a single factor might not itself be sufficiently probative of wrongdoing to give rise to a reasonable suspicion, the combination of several factors — especially when viewed through the eyes of an experienced officer — may." *United States v. Brown*, 334 F.3d 1161, 1165 (D.C. Cir. 2003) (internal quotation marks omitted). Moreover, the officers' actual motives have no bearing on the objective assessment of reasonable suspicion. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." (internal

quotation marks omitted)); *United States v. Christian*, 187 F.3d 663 670 (D.C. Cir. 1999) (holding that an officer's "actual motives for conducting [a] search [are] not relevant as long as his actions [are] objectively reasonable").

Considering the totality of the evidence, the Court concludes that, viewed objectively, the officers had reasonable articulable suspicion to conduct a limited pat-down of Defendant. The reasonableness of the officers' search is especially apparent given the recognized danger to officers when conducting traffic stops. *See, e.g., Wilson*, 519 U.S. at 413 (explaining that "traffic stops may be dangerous encounters" and recounting statistics of officers injured or killed during traffic stops); *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (recognizing "the inordinate risk confronting an officer as he approaches a person seated in an automobile").

In this case, at least two factors support the objective reasonableness of the officers' limited search of Defendant. First, while the officers were conducting a search of the stopped vehicle, Defendant was standing against the vehicle in a way that the officers found suspicious. Defendant was leaning against the car with the front side of his belt-line touching the vehicle. Officer Sanders testified that "how he was standing, it was in the motion of trying to conceal something in the front half of his body." May 14, 2019 Hr'g Tr. 34: 25- 36: 1.

The Court finds it reasonable that Defendant's apparent attempt to conceal parts of his body would contribute to the officers' reasonable articulable suspicion that Defendant could be dangerous. *See United States v. Dortch*, 868 F.3d 674, 680 (8th Cir. 2017) (finding reasonable suspicion, in part, because the defendant appeared to be concealing something by "pressing the front of his body against the minivan"). Defendant argues that his standing position could not have been overly suspicious because the officers did not ask him to change position. But, the

14

Court finds it irrelevant that the officers never asked Defendant to stand in a different position. Whether or not Defendant would have complied with such an order has no bearing on the suspiciousness of the position in which Defendant elected to stand.

Second, Defendant's repeated attempts to leave the scene aroused the officers' reasonable suspicion. When Defendant was first asked to exit the vehicle, Defendant attempted to walk away. He then began requesting the return of his identification card, saying that he had "nothing to do with this," and asking to go to his father's house which was nearby. May 14, 2019 Hr'g Tr. 13: 2-9. Defendant told Officer Sanders that he wanted to go home, and Officer Sanders had to explain that Defendant needed to wait for the investigation to be completed. Gov.'s Ex. 1, 4:50. He had to be told to "relax" by the officers multiple times.

And, when Officer Kelly asked Defendant to step away from the stopped vehicle so that the trunk could be searched, Defendant saw another vehicle driving by and again made comments about wanting to leave. May 14, 2019 Hr'g Tr. 15: 21-23. Defendant then walked slightly past Officer Kelly, away from the scene of the investigation and towards the car that had just driven by. *Id.* at 56: 5-57: 2; Gov.'s Ex. 3, 14: 15. Officer Kelly had to move towards Defendant and stop him. Gov.'s Ex. 3, 14: 18. Officer Lopez can then be heard saying that Defendant should be patted down because "he keeps trying to walk away." Gov.'s Ex. 2, 10: 22. It was reasonable for the officers to consider suspicious Defendant's repeatedly attempts to leave the scene during the pendency of the investigation. *See U.S. v. Brown*, 334 F.3d 1161, 1168 (D.C. Cir. 2003) (explaining that "furtive" movements in reaction to police presence can contribute to reasonable articulable suspicion).

While the Court concludes that Defendant's suspicious way of standing and his repeated attempts to leave the scene were sufficient to sustain the officers' reasonable articulable suspicion, the Court cannot ignore Defendant's admission that he had a firearm. Prior to conducting the pat-down, Officer Lopez asked Defendant if he had any weapons on him, and he replied affirmatively. Then, Officer Kelly asked what type of weapon he had. Defendant stated, "I got a gun." May 14, 2019 Hr'g Tr. 17: 18-18: 8; Gov.'s Ex. 2, 10:38. Defendant's admission that he had a weapon occurred prior to the officers' limited pat-down of Defendant. Accordingly, Defendant's admission further justified the limited pat-down.

Defendant contends that this statement cannot be used to justify the officers' limited pat-down because Defendant's admission was not voluntary. According to Defendant, the officers had temporarily detained him and he was not free to leave. As such, Defendant contends that his statements were involuntary.

The Court agrees that, following the lawful traffic stop, Defendant was temporarily detained and his freedom of movement was curtailed. *See Berkemer v. McCarty*, 468 U.S. 420, 435-36 (1984) (explaining that traffic stops curtail the "freedom of action" for the driver and passenger). However, this temporary detention does not render involuntary statements made in response to relevant police questioning. As the United States Supreme Court has explained, during a *Terry* stop, "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id.* at 439.

Here, based on their suspicions and prior to conducting a limited pat-down, the officers asked Defendant if he was armed. Defendant responded affirmatively. As such, Defendant's admission that he had a firearm further justified the officers' limited pat-down.

In summary, the Court concludes that the officers' limited search and seizure of Defendant was proper. The initial stop of the vehicle in which Defendant was a passenger was lawful on the ground of a suspected window tint violation. During the pendency of the investigation, Defendant was temporarily and properly detained. While Defendant was justifiably detained, the officers developed reasonable articulable suspicion to conduct a limited pat-down of Defendant based on the suspicious manner in which Defendant was standing and on Defendant's repeated attempts to leave the scene. Moreover, when asked, Defendant admitted that he had a firearm. Accordingly, the search and seizure were not in violation of the Fourth Amendment. Any and all tangible evidence and statements obtained during the February 27, 2019 search and seizure should not be suppressed.

### III. CONCLUSION

For the foregoing reasons, the Court concludes that the February 27, 2019 search and seizure of Defendant which resulted in the discovery of Defendant's loaded firearm without a serial number was not in violation of his Fourth Amendment rights. Accordingly, the Court will DENY Defendant's Motion to Suppress. An appropriate Order accompanies this Memorandum Opinion.

/s  
**COLLEEN KOLLAR-KOTELLY**  
United States District Judge